IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Criminal Action No. 05-cr-00102-F

UNITED STATES OF AMERICA,

      Plaintiff,

v.

BILLY PAUL HURST,

      Defendant.

---

## ORDER ON PENDING MOTIONS

---

This matter came before the Court on April 21, 2006 for a hearing on the following pending motions: Defendant's Motion to Suppress (Dkt. # 20), filed May 13, 2005; Defendant's Second Motion for Severance filed July 7, 2005 (Dkt. # 35); Defendant's Second Motion to Suppress (Dkt. # 36) filed July 7, 2005; and Defendant's Amended Motion to Suppress (Dkt. # 37) filed July 8, 2005.

## I.  BACKGROUND

Defendant Hurst was first indicted on March 10, 2005, in a four-count indictment that relates to two incidents, one of which occurred on October 7, 2004 and the other on November 12, 2004.  A superceding indictment was filed on June 7, 2005, in which a fifth count was added.

### A.  The First Indictment

In the initial indictment, Counts I and II allege that on October 7, 2004, defendant, a previously convicted felon, was in possession of a weapon (a .357 caliber

revolver) in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2) (Count I), and on the same date knowingly possessed with intent to distribute a quantity of methampheta-mine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count II).

Counts III and IV of the initial indictment allege that on November 12, 2004, defendant, as a previously convicted felon, was in possession of a weapon in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2) (Count III), and that the weapon was an unregistered shotgun, possessed in violation of 26 U.S.C. §§ 5861(d) and 5871 (Count IV).

On April 8, 2005, Defendant Hurst filed a Motion to Sever Counts I and II from Counts III and IV (Dkt. # 13), asserting that the offenses were not similar in character. The motion was denied by Order entered on April 11, 2005 (Dkt. # 14).

On May 13, 2005, Defendant Hurst filed his Motion to Suppress (Dkt. # 20), addressed to both incidents referenced in the first indictment.

**B.     The Superceding Indictment (Dkt. # 25)**

On June 7, 2005, before the motion to suppress was ruled on, a superceding indictment was filed against defendant.  The superceding indictment restated the four counts of the original indictment, but added to Count I a shotgun found in the trunk of the car on October 7, 2004 as an additional unlawfully possessed weapon, and added as Count V a charge that on March 13, 2005, defendant unlawfully possessed a different .357 caliber revolver in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2).

2

### C.    Motion to Sever Counts (Superceding Indictment) (Dkt. # 35)

On July 7, 2005, defendant filed a Motion to Sever Count V of the superceding

indictment from Counts I through IV, asserting that defendant is prejudiced by having

this additional weapons charge joined with the two previous ones, as joining the

charges would tend to corroborate the commission of each other by showing a

"disposition or propensity of the defendant to commit such crimes" that would be

impermissible under F.R.E. 404(b).  The motion also argues that the incidents occurred

on different dates and involve separate witnesses, and thus are not properly joined.

### D.    Second Motion To Suppress and Amended Motion to Suppress (Dkt. ## 36 and 37)

On July 7, 2005, the defendant filed a Second Motion to Suppress Evidence and

Statements (Dkt. # 36) relating solely to the March 2005 incident that is the subject of

Count V of the superceding indictment (*see* footnote 1).  On July 8, 2005, defendant

filed an Amended Second Motion to Suppress Evidence and Statements relating solely

to the incident that is referenced in Count V of the superceding indictment (Dkt. # 37)

(*see* footnote 1).  Counsel for defendant stated in open court on April 21, 2005, that the

Amended Motion to Suppress (Dkt. # 37) supercedes the Second Motion to Suppress

(Dkt. # 36), and therefore the Second Motion to Suppress (Dkt. # 36) is DENIED as

moot.

## II.      DEFENDANT'S MOTIONS

### A.      Motion to Suppress Relating to First Indictment (Dkt. # 20)

In this motion defendant first seeks to suppress evidence and statements

obtained on October 7, 2004, when the car defendant was driving was stopped for a

potential traffic offense, defective brake light.  State Trooper Saunders, allegedly

without defendant's permission, searched the car.  According to the motion, the trooper

found a handgun, three baggies containing a white substance, later identified as

methamphetamine, and a Springfield .410 gauge shotgun in the trunk.  The motion

asserts a lack of probable cause for the stop, an excessive scope of detention for a

traffic stop, and a nonconsensual search, or alternatively a search in excess of the

consent given.  The motion also seeks to suppress two statements made by the

defendant to the trooper, one of which was admittedly given without a *Miranda* warning,

and therefore is argued to be involuntary, and one that was given after a *Miranda*

warning, but argued by defendant to have been the "fruit of the poisonous tree" as

it occurred after an unlawful search.

Defendant also seeks to suppress evidence and statements obtained during a

search of defendant's premises and surrounding area, part of which occurred late on

the evening of on November 11, 2004 and apparently continued during the early hours

of November 12, 2004.  According to defendant's motion, the initial search was carried

out by Montezuma County Sheriff's Deputies Orosco and Vigil at defendant's rural

property located between the towns of Delores and Manco, Colorado, where he lives

in a residential trailer with his two sons.  The search apparently originated as an

4

investigation of potential stolen property suspected to be on defendant's property, was alleged to be carried out without the consent of defendant (who was not present at the time) and contrary to refusals to search issued by his sons, aged 17 and 11. During the initial investigation the officers spotted what they thought was a portion of the allegedly stolen property (a towing trailer claimed to have been stolen by a Norman Butler), photographed the trailer, and thereafter showed the photo to Butler, who identified his trailer.

According to the motion, the Sheriff's Department then obtained a search warrant at 12:46 a.m. on November 12, 2004 from a judge, and at approximately 12:50 a.m. the deputies (apparently advised by telephone that a warrant had been signed but without physical possession of the warrant) entered defendant's premises, seized defendant and handcuffed him, gave him *Miranda* warnings and explained the reason for the search. The motion states that defendant asserted that the "trailer and the stuff on it" were traded for money owed to him. At that point, defendant was placed under arrest for "theft by receiving." The deputies entered the trailer/residence on the property where they located the sawed-off shotgun that is the subject of Counts III and IV of the indictment.

The motion first seeks to suppress all evidence seized on November 12, 2004 the grounds that the initial investigation unlawfully invaded the "curtilage" of plaintiff's property and therefore all observations and searches thereafter are the "fruit of the poisonous tree." The motion also argues that the later search of the trailer and seizure of the sawed-off shotgun were unlawful because (1) the warrant was not present at the

5

property when the search occurred, and (2) in any event the warrant was improperly

executed because of a "no knock" entry into the defendant's trailer.

**B.      Defendant's Second Motion for Severance (Dkt. # 35)**

On July 7, 2005, defendant filed a Motion to Sever Count V of the superceding

indictment from Counts I through IV, asserting that defendant is prejudiced by having

this additional weapons charge joined with the two previous ones, as joining the

charges will tend to corroborate the commission of each other by showing a

"disposition or propensity of the defendant to commit such crimes," impermissible under

F.R.E. 404(b).  The motion also argues that the incidents occurred on different dates

and involve separate witnesses, and thus are not properly joined.

**C.      Amended Second Motion To Suppress (Dkt. # 37)**

On July 8, 2005, defendant filed his Amended Second Motion to Suppress

Evidence and Statements which relates solely to the incident that is referenced in

Count V of the superceding indictment (*see* footnote 1). (Dkt. # 37).

The Amended Second Motion to Suppress seeks to suppress all evidence

obtained in a search of defendant's vehicle that occurred on the evening of March 12,

2005 carried out by Colorado Division of Wildlife Officer Zachary Holder at the Summit

Lake Wildlife Area in Montezuma County.  As set forth in the motion, Officer Holder

noticed the defendant and two other individuals, along with two vehicles, near the lake

boat ramp engaged in conduct that he believed might violate Wildlife Commission

regulations prohibiting being on Summit Lake Wildlife Area after dark while not actively

engaged in fishing.  Defendant produced a valid driver's license, but the others did not, although they provided their names to Holder.

Holder testified at the suppression that he decided to run a check to see if the others had valid licenses and to determine if there were outstanding warrants.  He broadcast the names over the radio, and received a message from another officer advising him that Hurst and one of the others were known felons, and that he should be careful.  Holder also ran a check of the vehicle license plates, and received a message back that the license plate number on the vehicle Hurst was driving did not match the description of the vehicle, although unbeknownst to him at the time he had miscopied the vehicle license plate number.  Due to the mismatch of license plate vehicle number and description, and the information provided about defendant, Holder believed he might be dealing with a stolen vehicle and called the Montezuma County Sheriff's Office to request backup.

Within a few minutes, County Sheriff's Deputy Spruell arrived on the scene. He instructed Holder to obtain the VIN number from the vehicle driven by Hurst so they could again run a vehicle check.  Using a flashlight to look inside the windshield, Holder saw what appeared to be the barrel of the cylinder of a revolver sticking out from the crack beside the driver's seat.  Officer Spruell asked the defendant provide vehicle registration, and Holder entered the car and removed the weapon.

According to the defendant's motion, Officer Spruell asked the defendant "who the gun belonged to."  According to the motion, defendant, without being given a *Miranda* warning, responded that the gun belonged to him.  Spruell then asked the

7

defendant if he was a convicted felon, and defendant responded that "he used to be but had gotten all of that taken care of."

Defendant's motion contends that Officer Holder had no reasonable suspicion to support the stop of defendant and the others; that the scope of the detention exceeded the purpose of the stop, that defendant was not given a *Miranda* warning before making the statements to Officer Spruell, and therefore all statements and evidence should be suppressed.

## III.   ANALYSIS

### A.   Motion to Sever Count V (Dkt. # 35)

The Court denied a similar motion by Order of April 11, 2005.  This motion too is denied for the following reasons.  Under Rule 14(a), F.R.Crim.P., severance of counts of an indictment is warranted only upon a showing of prejudice to the defendant. In *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997), *cert. denied*, 525 U.S. 829 (1998), the court stated that "[p]rejudicial joinder occurs under Rule 14 when an individual's right to a fair trial is threatened or actually deprived" citing to *United States v. Holland*, 10 F.3d 696, 699 (10th Cir.1993), *cert. denied,* 510 U.S. 1064 (1994).  "The defendant bears a heavy burden of showing real prejudice from the joinder of the two counts. . . .  In establishing real prejudice, the defendant must demonstrate that the alleged prejudice he suffered outweighed the expense and inconvenience of separate trials."  *United States v. Martin*, 18 F.3d 1515, 1518 (10th Cir. 1994) (citations and internal quotation marks omitted).  Defendant Hurst has not come forward with any showing of actual prejudice resulting from the joinder of Count V

8

with the other counts, nor has he shown that any asserted prejudice outweighs the expense and inconven-ience of two trials.

The fact that Count V involves a charge of felon in possession of a weapon, as do Counts I and III, does not supply the prejudice required to justify severance as argued by Defendant Hurst. In *United States v. Muniz*, 1 F.3d 1018, 1023 (10th Cir. 1993), the Tenth Circuit recognized that "prejudice to the defendant is more likely since proof of one crime may tend to corroborate the commission of the other crime in violation of the evidentiary rules against evidence of a general criminal disposition or propensity to commit crime." Nonetheless, the circuit panel held that the argument was unconvincing in that case as "[t]he two counts were separate and distinct, and the evidence presented at trial was not too confusing or unfairly overlapping. The offenses took place on different dates at different locations, and different witnesses and evidence were presented on each count." 1 F.3d at 1023.

Here too, the counts relate to discrete events occurring on separate days, and the evidence is likely to come from different witnesses. The jury is not likely to be confused about the two incidents. Moreover, it is far from clear, as the defendant asserts, that evidence relating to one incident of possession would not be admissible under Rule 404(b) in connection with another incident. The Rule permits evidence of an offense for a number of reasons including intent, knowledge and "absence of mistake or accident." Without prejudging the issue, Defendant Hurst's proferred defense to one charge of possession may well give rise to the admissibility of the other incident should he claim mistake, lack of intent or lack of knowledge.

**B.      First Motion to Suppress (Dkt. # 20)**

1.      The Events of October 7, 2004

The government has the burden of demonstrating that the seizure it seeks to

justify on the basis of a reasonable suspicion was sufficiently limited in scope and

duration to satisfy the conditions of an investigative seizure.  *See e.g. United States v.*

*Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993).  At the hearing on April 21, 2006, the

government sought to meet its burden of proof on the constitutionality of the stop

and search by calling Trooper Saunders as a witness.  Saunders testified that on the

evening of October 7, 2004 at approximately 10:12 p.m., while on patrol adjacent to

Colorado Highway 160, he observed a tan vehicle pull into the parking lot of a truck

stop, make a U-turn, and pull back onto a county road.  He observed that the right

brake light was not operating.  He followed the car as it stopped at three stop lights,

confirmed that the brake light was not functioning, and pulled up behind the car with

his emergency lights on, and the car pulled over to the side of the road.

Saunders asked the driver to produce a driver's license, registration and proof of

insurance. The driver did not produce a driver's license, but identified himself as Billy

Paul Hurst, the defendant, and provided a date of birth.  Defendant Hurst did not

produce proof of insurance.  He provided registration for the vehicle, but it showed the

car was registered to a Peter Mola.  Saunders asked Hurst who Mola was, and Hurst

replied that Mola was a friend.  Saunders was not asked in direct or cross-examination

if he asked Hurst whether Hurst was driving the car with Mola's permission, but upon

questioning by the Court Saunders indicated that Hurst had stated that it was "okay" for

10

him to be driving his friend's car.  Saunders also testified that the VIN number on the registration matched the VIN label on the vehicle.

Saunders nonetheless testified that while he thought it "suspicious" that the registration was not in Hurst's name, he made no independent investigation to determine if Hurst was in rightful possession of the car.  Saunders did not attempt to contact Mola nor did he ask dispatch to do so, and did not even ask Hurst for Mola's telephone number.  Yet, on examination by the Court, Saunders admitted that he checked with dispatch to see if the car was reported stolen, and he apparently received a negative response.

Trooper Saunders also testified that he asked Hurst, apparently early on, if he had any weapons in the car, to which Hurst responded that he did not.  Saunders further testified that he detected the "faint smell" of alcoholic beverage on Hurst's breath, and asked whether he had been drinking.  He ultimately asked Hurst to take a roadside sobriety test, which Hurst agreed to do.  Saunders testified that Hurst performed "satisfactory" on the roadside, that he so advised Hurst, and told him that he was not being arrested for driving under the influence.

Saunders also testified that prior to performing the roadside test, he contacted his dispatch center in Montrose, Colorado about Hurst to ascertain whether Hurst had a valid driver's license.  Saunders testified that he was advised that Hurst had a valid driver's license, and there were no outstanding warrants.  Saunders also asked dispatch to perform what he called a "Queen Henry," apparently a colloquialism for "query history."  The information reported back that Hurst had a history of "controlled

11

substances," apparently meaning contact with the judicial system regarding illegal drugs, but not necessarily a conviction for a drug offense.  Saunders also learned that Hurst had "violent crimes," "non-violent crimes" and "weapons violations" "on his record," although the exact nature of the information was not explained.

Apparently based on this criminal history information, plus a "bulletin" that Saunders had received from the state trooper area office indicating that Hurst may be an individual who is to be handled with extreme caution, Saunders continued to ask Hurst questions.  He again asked if there were weapons inside the car, to which Hurst responded "no" but that he had a pocket knife.  He asked Hurst if there was marijuana in the vehicle, to which Hurst replied "no."  He asked if there was methamphetamine in the care, to which Hurst replied "no," but according to Saunders when providing this answer Hurst looked away saying "I wish I had some pain killers."  Saunders testified that based on his training he thought this was a sign of evasiveness.

Apparently after all the above events unfolded, Saunders asked Hurst if he could take a look inside the car.  Saunders testified that Hurst responded "yeah, sure, it is not my vehicle, but I don't have a problem with it."  Saunders then asked if everything in the car belonged to Hurst, to which he responded, according to the trooper, "Yeah, I think."  Saunders testified that according to his notes, the "search" of the car occurred at 10:49 p.m., or approximately 23 minutes after the initial traffic stop.

Saunders testified that he searched the front of the car and found a loaded revolver under the front passenger seat and a glass pipe with white residue in the back of that seat.  He testified that at that point he stopped his search and radioed for

12

backup because he felt there was a potential for defendant to harm him given the weapon he had found.  After the backup arrived, he resumed his search and found another glass pipe under the front passenger seat.  He interrupted the search to place Hurst and the passenger in his patrol car.  He again resumed searching and found a gray bag containing a digital scale, a magnifying glass, two playing cards, eight empty plastic baggies, and three baggies filled with a white crystal substance.

After finding these items Saunders checked the trunk of the car and found a spring-filled .410 gauge shotgun.  Saunders testified that after finding these items he placed Hurst under arrest for possession of methamphetamine.  He noted the time of arrest as 11:25 p.m., which would have been 36 minutes after the time he testified that the search commenced.  Saunders testified that he handcuffed the defendant, read him the *Miranda* warnings, which Hurst indicated he understood.  Thereafter, Saunders asked Hurst if any of the items found in the car belonged to the passenger to which Hurst replied "no."

Although defendant asserted in his motion that there was no probable cause for the traffic stop by Officer Saunders because the brake light was not defective (Defendant's Motion at 6), he offered no evidence at the suppression hearing to support this argument.  And although Trooper Saunders did not give defendant a ticket for a defective brake light and there is no corroborative evidence of the defective light, there is also no reason to disbelieve his testimony that his motive for stopping defendant was the defective brake light.  Accordingly, the Court finds there was probable cause for the stop.

13

The permissible scope of an investigatory detention, such as the traffic stop here, depends on "the particular facts and circumstances of each case" and must "last no longer than is necessary to effectuate the purpose of the stop" so as to "be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). As recognized in *United States v. Mendez*, 118 F.3d 1426, 1427 (10th Cir. 1997): "An officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen.  However, once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning."  (Citations omitted).

There are narrowly crafted exceptions to this constitutionally based protocol. Ordinarily an officer may question occupants as to travel plans and history and the driver's authority to operate the vehicle.  *See United States v. Holt*, 264 F.3d 1215, 1220-21 (10th Cir. 2001); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989).  However, "motorists ordinarily expect to be allowed to continue on their way once the purposes of a stop are met."  *Holt, supra*, 264 F.3d at 1221.  Or, as the Tenth Circuit panel stated in *United States v. Pina-Aboite*, 2004 WL 1814192 at **6 (10th Cir., Aug. 16, 2004), once the original suspicion justifying the stop "was dispelled, the sole purpose of the stop was met, [and the officer] was not justified in extending the scope of the detention, and

14

he should have returned the defendants' documents and allowed them to continue on their way." (Citation omitted).

In the instant case, Trooper Saunders stopped Hurst for a defective brake light, but in response to questioning by the Court testified that he was not going to give Hurst a ticket for a defective brake light. Hurst was not able to produce a valid driver's license, but based on a check with dispatch Saunders ascertained that Hurst had a valid license and there were no outstanding warrants. In response to questioning by the Court, Saunders testified that he was not going to give Hurst a ticket for driving without a license. Saunders also testified that although driving without proof of insurance is an "arrestable offense," Saunders testified in response to questioning by the Court that he was not going to arrest Hurst for that infraction, although he possibly would have given him a ticket. And although Saunders testified that he suspected the vehicle might be stolen due to the fact that the vehicle registration did not reflect that Hurst owned the car, the Court does not find that such supposition warranted further detention of Hurst, particularly given Saunders own admission that he performed no independent investigation to determine if Hurst was in rightful possession of the car and he had no information that the car was stolen. Finally, while Saunders testified that he detected the faint smell of alcohol on Hurst, he clearly conceded that Hurst satisfied the roadside sobriety test, and he so advised Hurst that he would not be charged with driving under the influence.

In the Court's view, at this point in the traffic stop it appears that all the reasons for the initial detention had been dispelled. Accordingly, under the above-cited

15

authorities, Saunders should not have further detained Hurst or asked him any further questions.

However, as the panel stated in *Pina-Aboite* citing to published Tenth Circuit cases, even when the officer is not justified in prolonging the detention for a regulatory purpose, it is permissible for an officer to detain a driver for further questioning "if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." 2004 WL 1814192 at **7. "Reasonable suspicion is a minimal level of objective justification which the officers can articulate, as distinct from an inchoate and unparticularized suspicion or hunch." *Id.*

Here, the only articulated basis for Saunder's suspicion that led him to continue questioning Hurst was the background information he received indicating that Hurst had some unspecified criminal history that included contact with law enforcement agencies in connection with controlled substance, weapons violent and nonviolent offenses. The government argues, citing to *United States v. McRae*, 81 F.3d 1528, 1535 n.5 (10th Cir. 1996), that while criminal involvement is not enough by itself to provide the requisite "reasonable suspicion" it can be a factor, when coupled with other factors, to give rise to an articulable suspicion (Government's Brief at 8). However, according to the sequence of events as related by Saunders, the only other factors the government cites to support his purported reasonable suspicion of illegal activity, other than the above discussed matters that the Court finds had been dispelled by the time Saunder's questioning continued, is Hurst's purported "evasive" response to the question about methamphetamine in the car (*id.* at 7-8). Yet, as set forth in *Mendez,*

16

*supra*, such additional questioning should not even have occurred under these circumstances.

It is also true, that upon an articulable and reasonable belief that a motorist is potentially dangerous a police officer may search the interior compartment of a car that has been stopped. *Holt, supra,* 264 F.3d at 1239, citing to *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983).  However, police are acting contrary to *Terry* standards *(see Terry v. Ohio,* 392 U.S. 1 (1968)) by interrogating stopped motorists as to the presence of weapons in the car where there is no particularized suspicion of such danger. *Holt, supra*, 264 F.3d at 1239.  In addition, in the interest of safety, the police may order the occupants out of a stopped vehicle even in the absence of any particularized suspicion of potential danger. *Holt, supra,* 264 F.3d at 1222.

In the present case, Trooper Saunders did articulate a concern about personal safety and stated that he called for backup as a result of that concern, but the concern only arose after his search when he found the loaded weapon in the car.  At no point earlier in the sequence of events did Trooper Saunders manifest a concern about his personal safety that justified a search of the car, or even the asking of additional questions about weapons.  In fact, from his own testimony it appears that he was so unconcerned about his personal safety under these circumstances that he allowed the passenger to remain in the car while he carried out a sobriety test of the defendant. On this record, the Court cannot find that the officer articulated a belief that Hurst or his passenger was dangerous, or that he acted out of a concern for personal safety.

Accordingly, as was true in *Pina-Aboite, supra*, it appears from Saunders' testimony that he was acting on an "inchoate and unparticularized hunch rather than a reasonable articulable suspicion."  2004 WL 1814192 at **9.  Under the circumstances the Court cannot find that Hurst's criminal history, and the asserted evasiveness of his answer to a question that should not have been asked (the alleged evasiveness to which is itself questionable), can supply the reasonable suspicion to justify continued detention of the defendant, and therefore in the absence of such suspicion was a violation of his Fourth Amendment rights.

The Government argues here that the search of the car was voluntary, as defendant purportedly told Saunders he could go ahead and search the car as it did not belong to him (Government Brief at 9-10).  Defendant offered no evidence to refute Saunders testimony on this point.  As stated in *Pina-Aboite, supra,* "[a] search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances," quoting *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994).  *Pina-Aboite,* however*,* restated the three "especially relevant" factors that a court should consider in determining whether a consent is tainted by a preceding illegal search or seizure: 1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct. 2004 WL 1814192 at **10*,* citing to *Brown v. Illinois,* 422 U.S. 590, 603-04 (1975).

Applying these three factors to the circumstances in the instant case, this Court concludes that the consent by Hurst cannot be found to be voluntary.  First, it came

18

almost immediately, if not simultaneously, with the improper detention.  Second, unlike

the situation in *Pina-Aboite*, and the cases cited therein, there were no "intervening

circumstances" such as the return to Hurst of the vehicle registration, or a statement to

him by the officer that he was free to go, or an advisement that he did not have to

permit a search of the car.  There is no evidence that this event was converted to a

"consensual encounter."  Finally, the Court has already found that Saunders appeared

to be acting solely on a hunch, or perhaps a predisposition that Hurst, apparently a

known quantity for trouble in the area, was up to no good.  Thus, Saunders, like the

officer in *Pina-Aboite*, embarked on a follow-up fishing expedition in the hope that

something might turn up.  Saunders was correct; something did turn up, but it turned

up ultimately in violation of Hurst's Fourth Amendment rights.  There was not sufficient

attenuation or break in the causal connection between the illegal detention and the

purported consensual search, and therefore the government has not met its heavy

burden of proving that the defendant's consent was voluntary.

In the alternative, the government argues that under the doctrine of "inevitable

discovery" the seized objects should be admissible, even if the search was unlawful, as

the evidence would have been discovered independently.  The Government urges that

the car Hurst was driving would have been impounded and searched because of the

circumstances of no driver's license, no proof of insurance and registration to a person

not present (Government Brief at 12-13).  The Court cannot agree that this argument

justifies the admissibility of the seized evidence.  Although Trooper Saunders testified

on direct examination that the car would have been impounded "if it was left" at the

scene, and answered the Court's questions by stating that he believes that he would have impounded the car, there was no basis to do so.  Saunders stated to the Court that he had received a report indicating that the car was not stolen.  Thus, he had no basis to impound the car.

Although the initial traffic stop was justified, the continued detention and the lack of a demonstrably voluntary search leads this Court to conclude that the fruit of the illegal search tree must be suppressed.  The weapons, methamphetamine and drug paraphernalia found in the car, as well as the statements made by Hurst to Saunders prior to the *Miranda* warning, must be excluded from evidence in this case.

Defendant argues that the statement attributed to him by Saunders as having been made after the arrest and after the *Miranda* warning, to the effect that nothing in the car belonged to the passenger, also must be suppressed as fruit of the poisonous tree.  The government argues that the post-arrest statement was made after defendant was fully *Mirandized,* and there are no indicia in the record that the statements were coerced or that defendant failed to make a knowing and intelligent waiver of his rights.  Citing several cases that address whether a statement should be found to be voluntary under the "totality of the circumstances test," the government argues that under the totality of the circumstances here the post-arrest statement should be found to be voluntary and admissible (Government's Brief at 16-17).

The Court first notes that none of the cases on which the government relies involve a *Mirandized* statement made following an unlawful search and seizure.  On the other hand, defendant's simple citation to *Wong Sun v. United States*, 371 U.S. 471

(1963) and the "fruit of the poisonous tree" doctrine does not by itself resolve the issue

either.  For as the Tenth Circuit has stated in a similar situation, when an asserted

consensual act preceded by an illegal search yields evidence, the evidence may be

admitted if the government can "establish a break in the causal connection between the

illegality and the evidence obtained."  *Melendez-Garcia*, *supra* 28 F.3d at 1053 (10th

Cir. 1994), quoting from *United States v. Recalde*, 761 F.2d 1448, 1458 (10th Cir.

1985).  *See also United States v. Carson*, 793 F.2d 1141, 1147-48 (10th Cir.), *cert.*

*denied,* 479 U.S. 914 (1986).  Thus, the decision in *Melendez-Garcia* concludes that

while consent that is voluntary may constitute an intervening act breaking the taint of

a prior illegal search, the government must also demonstrate a break in the causal

connection between the illegality and the consent, so that the court will be satisfied

that the consent was sufficiently an act of free will to purge the primary taint.  28 F.3d

at 1054.

In the instant case, the evidence shows that Hurst's post-arrest *Mirandized*

statement came immediately on the heels of the unlawful search of the car and seizure

of the drugs and weapons.  This Court cannot find a sufficient break in the causal link

between the illegal activity and the question posed to defendant regarding ownership of

the items in the car to render his statement voluntary.  Thus, the post-arrest *Mirandized*

statement must also be suppressed.

2. The Events of November 12, 2005

Defendant argues that during the initial visit to his residence, carried out by

Deputy Sherif'fs Officers Orosco and Vigil, their investigative search exceeded the

21

areas where "<u>visitors</u> are expected to go" (emphasis in original), thereby violating the

Fourth Amendment (Defendant's Motion at 18).  According to defendant, the officers

invaded the "curtilage" of his property in violation of the Fourth Amendment as held in

*United States v. Hatfield*, 333 F.3d 1189, 1197-98 (10th Cir. 2003).

Both Officers Orosco and Vigil testified at the suppression hearing, as did

Hurst's two sons, Daniel Tolleson, then aged 17 and Jeremy Hurst, then aged 11.  The

officers stated that they arrived at defendant's property at approximately 9:21 p.m. on

the evening of November 11, 2004 in order to verify statements that had been made

to them by one Doug Murdock, in connection with his stalled vehicle.

The officers testified that the gate to defendant's driveway was open when they

arrived, that they pulled their police vehicle into the driveway, and they approached the

defendant's residence trailer by walking up the defendant's driveway which passed

through an area cluttered with equipment and vehicles.  As noted above, Defendant

Hurst was not present.  Officer Orosco testified that as he approached the trailer he

shouted out "sheriff's office" at which time defendant's two sons came out of the trailer

to meet the officers.

The officers asked the boys questions about the claims of Mr. Murdock

regarding his reasons for being in the vicinity of defendant's property which the boys

confirmed.  The officers asked if they could look around.  According to the testimony of

the officers and the two boys, both boys were adamant that the officers could **not** look

around without a search warrant.  The officers turned around and began walking back

to their police vehicle when they noticed a welder that matched the description of one

reported stolen by a Mr. Norman Butler.  As the officers continued walking to return to their vehicle, they also observed a towing trailer sitting alongside the driveway.  Deputy Orosco testified that the unusual appearance of this trailer matched the description of a towing trailer also reported stolen by Mr. Butler.  Orosco testified that he recognized the unusual appearing trailer because of the description he had received from Mr. Butler. He instructed Deputy Vigil to retrieve a digital camera from their vehicle so they could photograph the trailer.  They did so (*see* Government Exhibit 14) and at that time one of defendant's sons approached the officers to inquire what they were doing.  The officers asked the boy if the trailer belonged to Defendant Hurst, and he replied that it did.  The officers than left the Hurst property.

The officers drove to the home of Mr. Butler, who had reported the stolen welder and trailer, showed him the image of the trailer in the digital camera, and he confirmed that the trailer was the one reported stolen.  The officers reported this information to the Sheriff's Office, and were instructed by a supervisory officer to return to watch the Hurst property while the sheriff's officers prepared the paperwork to obtain a search warrant for the Hurst property.

*Hatfield* states, with respect to observations made by police from the driveway of a suspect's home into his backyard (resulting in the sighting of a structure later found to be a location for growing marijuana plants) that:  "[W]hen the police come on to private property to conduct an investigation . . . and restrict their movements to places visitors could be expected to go (*e.g.*, walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment."  333 F.3d at 1194.

23

The court pointed out in *Hatfield*, as was true in the instant case, "Hatfield's driveway was open to the public, permitting the Officers to park their patrol car directly behind Hatfield's pickup.  The openness and accessibility of a driveway to the public has been an important factor that courts have used to conclude that an owner does not have a reasonable expectation of privacy and that police observations made from the driveway do not constitute a search."  *Id*.  Simply put, observations made while standing on a suspect's driveway do not constitute a search under the Fourth Amendment.

Hatfield also addressed a second observation of Hatfield's backyard by another officer from a location in Hatfield's adjacent open pasture.  This observation was also challenged as a Fourth Amendment violation.  The Court stated that "[l]inked to that core area of protected privacy is a home's curtilage.  At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of [the] home itself for Fourth Amendment purposes."  *Id.* at 1195 (internal quotation marks omitted). On the other hand, the court found that "open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance, . . . and the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment."  *Id.* at 1195-96.

Thus, in *Hatfield* the Tenth Circuit found that "the marijuana was located in the curtilage of Hatfield's home because the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment

protection." *Id.* at 1196.  Nonetheless, the court held that "Officer Harrold, however,

never physically invaded the curtilage when he observed the marijuana" because he

was standing in an adjacent open field looking into the curtilage.  *Id.*  Thus the opinion

notes that "[t]he question before us, therefore, is whether an observation of the

curtilage by the police from a vantage point in an adjacent open field violates an

expectation of privacy that is reasonable."  *Id.*

The court concluded that it was not, stating:

> Although privacy in the interior of a home and its curtilage
> are at the core of what the Fourth Amendment protects,
> there is no reasonable expectation that a home and its
> curtilage will be free from ordinary visual surveillance.  The
> Fourth Amendment protection of the home has never been
> extended to require law enforcement officers to shield their
> eyes when passing by a home on public thoroughfares.

*Id.* at 1196 (internal quotation marks omitted).

Yet, the court continued to analyze the facts before it:

> In the instant case, of course, Officer Harrold was not
> standing on a neighbor's property or on a public thorough-
> fare when he saw the marijuana in Hatfield's yard.  The
> observation was made from Hatfield's own pasture, and
> Hatfield makes much of the fact that Officer Harrold was
> trespassing in the pasture and in Oklahoma trespassing is
> a crime.  The crux of the issue before us, then, is whether
> the fact that the pasture was owned by Hatfield himself,
> and that persons in the field are trespassers, created a
> reasonable expectation of privacy from observations of
> Hatfield's curtilage made from the pasture.  We conclude
> that the Supreme Court's decision in [United States v.] *Dunn*
> [, 480 U.S. 294 (1987) and our decision in *Fullbright v.*
> *United States,* 392 F.2d 432, 433-35 (10th Cir.1968), dictate
> that the answer to that question is "no."

*Id.* at 1197.

The panel in *Hatfield* stated its conclusion in these terms:

> Following *Dunn* and *Fullbright*, we hold that police observation of a defendant's curtilage from a vantage point in the defendant's open field is not a search under the Fourth Amendment.  Even though we can conclude that Hatfield had a subjective expectation of privacy in the space immediately behind his house, this is not an expectation of privacy that society regards as reasonable, at least with respect to visual observations made from an adjoining open field.

*Id.*. at 1198.

The Tenth Circuit observed that Hatfield had relied "heavily" on the fact that the officer's  presence in his open field violated the state trespassing law, but concluded that this fact did not change the above analysis.  *Id.* at 1198.  Rather, the court explicitly held that the fact that a state may have chosen to protect the property interests of its citizens by making trespass a crime under state law does not affect the analysis of a person's Fourth Amendment interest."  *Id.* at 1199.

Applying the holdings of *Hatfield* to the instant case, the Court finds that the officers made the observation of the welder and the towing trailer while standing on the defendant's driveway.  As *Hatfield* states, such an observation does not constitute a search. Therefore, the fact that defendant's sons instructed the officers that they could not look around does not change the observation of the welder and trailer into an unauthorized search.

In addition, Hurst's sons testified at the suppression hearing, contrary to the testimony of the officers, that the gate across Hurst's driveway was shut and locked on the night of this incident, as it supposedly always was when Hurst was not present.

26

Therefore, the boys surmise, the officers must have entered the property by climbing over or through the gate, not by driving into an open driveway, and therefore defendant suggests they were trespassing.  The Court, however, finds this testimony by the two boys not credible, due not only to their demeanor as witnesses and their bias in favor of defendant, but also because the testimony is inconsistent with other evidence that the gate was left unlocked at other times when Hurst was not present.

Defendant Hurst, like Hatfield, seeks to make much of the fact that the officers were apparently "trespassing" on his property, or at least violating his posted "no trespassing" signs, when they made the observation.  But as *Hatfield* states, this fact does not render the observation a violation of the Fourth Amendment.

Accordingly, the Court finds under the analysis of *Hatfield*, that even if the were looking into the "curtilage" of Defendant Hurst's property from his driveway, the observations by Officer Orosco and Vigil, the taking of pictures of the towing trailer, and the obtaining of a warrant based on such conduct is not violative of defendant's Fourth amendment rights.

Defendant also argues that even if the warrant was not improperly obtained, the subsequent search of his property constitutes an independent violation of his Fourth Amendment rights because the search warrant was not physically present, and the officers did not announce their presence, before entering the residence trailer and conducting the search that led to discovery of the sawed-off shotgun (Motion at 19-22).

The Court finds both of these arguments without merit.  In *United States v. Katoa*, 379 F.3d 1203 (10th Cir. 2004), *cert. denied,* 543 U.S. 1175 (2005) the panel stated the following rule:

> We begin by noting that there is no constitutional requirement that an officer present a warrant prior to a search.  As the Supreme Court recently reaffirmed in *Groh v. Ramirez*, 540 U.S. 551 . . . (2004), the Fourth Amendment does not necessarily require officers to serve a warrant at the outset of a search:
>
> neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search. . . .  Quite obviously, in some circumstances . . . it will be impracticable or imprudent for the officers to show the warrant in advance.

379 F.3d at 1205 (quoting *Groh*).  Thus there is no absolute requirement for the presence of the warrant prior to commencement of the search.  Here, there were practical reasons to commence the search before the warrant was physically present as it was issued by a court some distance away.  During the time the warrant was being obtained the officers had observed Defendant Hurst return to the property at approximately 10:03 p.m. and his sons could have alerted him to the police interest in the towing trailer.  Moreover, the warrant did arrive shortly after the search commenced, and defendant has not argued or shown any prejudice from the physical absence of the warrant, such as a search of an area not authorized by the warrant to be searched.[1]

---

[1]  Although defendant argued at the hearing that the warrant did not authorize a search of the trailer, and that such search could only have been conducted as part of a "security sweep" the Court disagreed and pointed out to counsel that the warrant provided for a search

The Court also finds no Fourth Amendment violation due to the manner of carrying out the execution of the warrant.  Officers Orosco and Vigil testified that upon returning to the defendant's property they waited for an additional officer named Sergeant Marston to arrive, and after being advised at approximately 12:30 p.m. that the warrant had been issued, the three of them entered the site and placed defendant under arrest and Officer Vigil read him his *Miranda* rights.  Officer Orosco and Sergeant Marston then approached the residence trailer, opened the door, and Officer Orosco shouted out "sheriff's office, search warrant."  The two officers encountered the two boys (who apparently were sleeping), placed them in restraints, and Officer Orosco searched the bedrooms of the trailer.  In one bedroom, he saw a sawed-off shotgun lying on a bed.  He seized it as part of his search.  This weapon is the subject of Counts III and IV of the superceding indictment.

Defendant appears to argue that this search and seizure violated the Fourth Amendment because the officers did not knock and announce their presence before entering the trailer.  Defendant also provided testimony, through the two boys, that the officers kicked in the door.  Cross-examination of the boys revealed, however,  that the door to the trailer had no handle, that the door did not properly fit the opening, and it was apparently standard practice to kick the door to make it open.  In addition, Officer Orosco testified that he did identify himself as a sheriff's officer before entering the

---

of "the residence, out buildings, and vehicles described above," and that the warrant described defendant's residence as located "at 37837 Hwy 184, Montezuma County, Colorado, further described as a white single wide" [trailer] with brown trim and no skirting . . . ."  Govt. Exhibit 19.1.

trailer, and even if the two boys did not hear his announcement, it is likely due to the fact the were sleeping.  The Court finds no violation of any "no-knock" rule under the Fourth Amendment in these circumstances.

Officer Orosco also testified that his entry into the residence trailer was both for the purpose of ensuring security for the scene of the arrest and for executing the warrant.  A security sweep of a house is permissible in connection with an arrest where the officers have a reasonable belief that the area to be swept harbors an individual posing a danger to those on the arrest scene.  *Maryland v. Buie,* 494 U.S. 325, 337 (1990).  Here, the officers knew that the two boys were likely in the trailer from their previous visit, and although both boys were young, they were old enough to pose a security threat to the officers arresting the defendant.

Finally, the fact that Officer Orosco seized the sawed-off shotgun that was lying in plain view on the bed, even though that object was not the subject of the search warrant, does not present a problem under the Fourth Amendment under these circumstances.  *See United States v. Tisdale*, 921 F.2d 1095, 1097 (10th Cir. 1990), *cert. denied* 502 U.S. 986 (1991) ("'Protective sweeps' are an exception to the warrant requirement under the Fourth Amendment permitted to ensure an arresting officer's safety. . . .  [¶] Once lawfully inside the trailer, the plain view doctrine applies to support [Officer] Tsoodle's seizure of the three guns.  Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.") (internal quotations and citations omitted).

Under these circumstances the Court finds that the entry into the trailer, the search of the trailer's rooms, and the seizure of the sawed-off shotgun lying in plain view, do not violate defendant's Fourth Amendment rights.

**C.      Amended Second Motion To Suppress (Dkt. # 37)**

Officer Holder testified that on the night of March 12, 2005, while on a routine patrol shortly before midnight, he encountered the defendant and two others near the Summit Lake boat ramp.  He thought it suspicious to see persons in the park that late on a night in March.  He investigated to see whether they needed help and also apparently to determine if they were violating "no camping" regulations or a state regulation that prohibited being in a park after dark unless actively engaged in fishing.

Attached as Exhibit 1 to the Defendant's Amended Second Motion to Suppress is a copy of a Colorado State Parks regulation containing a provision that appears to prohibit occupying a parking site with a motorized vehicle between the hours of 10:00 p.m. and 5:00 a.m., unless all occupants are actively engaged in fishing.  Defendant argues that while this regulation applies to state parks it does not apply to state wildlife areas, such as the one patrolled by Holder, and therefore defendant argues Hoder's stop of defendant was not lawful.

Apparently the Government does not take issue with defendant's position that the Parks regulation may not apply, and concedes that Holder may have been mistaken in believing the regulation applied at Summit Lake (Government Brief at 6-8).  Nonetheless, as the Government correctly argues, it does not matter whether the regulation actually applies, so long as Holder had a "minimal level of objective

31

justification" for making an investigatory stop. *Melendez-Garcia, supra,* 28 F.3d at 1051.  He testified that seeing persons at the lake boat ramp in the wildlife area at that time of night at that time of the year was "a little bit suspicious."  The Court finds that Holder had an objective justification for his stop of defendant and others on the night of March 12, 2005.

As set forth above, the "detention" of defendant and the two others included checking on the validity of driver's licenses and the registration of the vehicles, as well as whether there were outstanding warrants for the three men.  As stated above, such checks are lawful in connection with an investigatory stop.  In the course of checking for outstanding warrants, Officer Holder obtained information that Defendant Hurst and one other of the men were known felons who were potentially dangerous.  When he received information that the vehicle license plate did not match with the physical appearance of the vehicle, albeit due to his own mistake, he reasonably believed the car may have been stolen.  Given the information that he had, it was understandable that he would call for backup.  Within 15 minutes the backup officer arrived, and Officer Spruell directed him to check the VIN number of the car Hurst was driving so that they could re-run the vehicle identification.  Holder's check of the VIN number through the windshield was equally reasonable under the circumstances.  The gun was in plain view so that the search of the car and the seizure of the gun was not unlawful.

To be sure, the detention may have been prolonged due to Officer Holder's error in recording the license plate number, resulting in the return of information that the vehicle did not match.  However, having heard his explanation and having observed

Officer Holder's demeanor while testifying, and considering that he is a wildlife officer as opposed to a law enforcement official more highly trained in crime detection and suspect apprehension, the Court finds that this error was the product of an innocent mistake, and not a device to unduly lengthen the detention of defendant so as to gain some tactical advantage.  The record was quite clear that the correct information that matched Hurst's car with the license plate was not received by the officers until **after** the gun was found in the car.  Thus, the Court also rejects defendant's argument that the detention here unlawfully exceeded the purpose of the stop.

Finally, defendant argues that the two statements made by him to Officer Spruell must be suppressed because he was not given *Miranda* warnings despite being in custody (Defendant's Amended Second Motion at 8-9).   The government responds that defendant was not in custody at the time he made the statements, and therefore *Miranda* warnings were not required (Government Brief at 13-15).

Officer Spruell did not testify at the suppression hearing but Officer Holder related the sequence of events that led to Spruell's questioning of defendant.  Holder testified that immediately after the gun was spotted in the car and retrieved by him as Hurst was reentering the car to obtain his registration, Spruell asked defendant if the gun belonged to him.  Defendant purportedly replied that the gun was his.  Officer Spruell then asked Hurst whether he had a criminal record to which he purportedly responded that he was a felon, "but he had talked to the court and gotten it taken care of, and he was no longer a felon."

33

Holder testified that at the time these questions were asked, Hurst was not under arrest , he was not in handcuffs, he was not seated in the patrol car and he had not been told to sit on the ground.  Holder testified that Hurst was never taken into custody at all, but rather, after the gun was taken by Officer Spruell, Hurst was given a receipt and allowed to leave in his car after the registration information was cleared up.  Under such circumstances the Court agrees that Hurst was not in custody at the time the questions were posed by Officer Spruell and a *Miranda* warning was not required.

Finally, there is no indication that Defendant Hurst was coerced in any way into answering Officer Spruell's questions. As noted, he was not in custody and ultimately he was free to leave.  The answers were apparently provided voluntarily, without any coercion or compulsion on the part of the officer.  The Court finds no reason to suppress defendant Hurst's statements to Office Spruell.

## IV.    CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress (Dkt. # 20), filed May 13, 2005 is GRANTED in part and DENIED in part.  It is granted to the extent that any evidence seized or and statements made in connection with the traffic stop, search and seizure of October 7, 2004 are suppressed and excluded from evidence.

Defendant's Second Motion for Severance filed July 7, 2005 (Dkt. # 35 ) is DENIED.

Defendant's Second Motion to Suppress (Dkt. # 36) filed July 7, 2005 is DENIED as moot.

Defendant's Amended Motion to Suppress (Dkt. # 37) filed July 8, 2005 is

DENIED.

DATED: May 23, 2006

BY THE COURT:

*s/ Phillip S. Figa*
_____
Phillip S. Figa
United States District Judge